# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 29, 2009

Charles R. Fulbruge III
Clerk

No. 08-40746

In the Matter of:  THE PACIFIC LUMBER CO; SCOTIA PACIFIC
COMPANY LLC

Debtors

-------------------------------------------------------------------------------------------------

BANK OF NEW YORK TRUST COMPANY, NA, as Indenture Trustee for the
Timber Notes; ANGELO GORDON & CO. LP, AURELIUS CAPITAL
MANAGEMENT LP, AND DAVIDSON KEMPNER CAPITAL MANAGEMENT
LLC; SCOTIA PACIFIC COMPANY LLC; CSG INVESTMENTS; SCOTIA
REDWOOD FOUNDATION INC

Appellants

v.

OFFICIAL UNSECURED CREDITORS' COMMITTEE; Official Unsecured
Creditors' Committee Appellee, MARATHON STRUCTURED FINANCE FUND
LP; MENDOCINO REDWOOD COMPANY LLC; THE PACIFIC LUMBER CO;
UNITED STATES JUSTICE DEPARTMENT; CALIFORNIA STATE
AGENCIES

Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:08-MC-66

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges:

EDITH H. JONES, Chief Judge:

In this direct appeal from the bankruptcy court, The Bank of New York ("Indenture Trustee") and certain Noteholders[1] challenge the legality of a confirmed Chapter 11 reorganization plan ("plan"). Neither the bankruptcy court nor a motions panel of this court stayed plan confirmation pending appeal. In the brief interval between confirmation and oral argument in this court, the plan was substantially consummated. Plan proponents and current owners of the reorganized debtors, Mendocino Redwood Company ("MRC") and Marathon Structured Finance ("Marathon"), moved to dismiss this appeal as equitably moot due to their intervening actions.

We hold that equitable mootness does not bar review of issues raised on appeal concerning the treatment of the Noteholders' secured claims; nor does it bar re-evaluation of whether their administrative priority claim was correctly calculated; nor does it bar review of the plan's release clauses insulating multiple parties from liability. Equitable mootness does foreclose our review of issues related to the treatment of impaired and unsecured classes. Finally, we reject the Noteholders' complaints against the plan's payout of cash in full for

---

[1] Debtor Scotia Pacific initially joined in this appeal, but it was dissolved as part of the plan of reorganization and moved to be dismissed.

their allowed secured claim, but we remand the administrative priority claim. We also reverse in part the broad non-debtor releases.

## BACKGROUND

Six affiliated entities ("the Debtors") involved in the growing, harvesting, and processing of redwood timber in Humboldt County, California, filed separate Chapter 11 bankruptcy petitions on January 18, 2007, in the Southern District of Texas (a venue not known for its redwood forests). The six petitions were procedurally, but not substantively, consolidated and jointly administered by the bankruptcy court. This appeal concerns the reorganization of the principal debtors, Pacific Lumber Company ("Palco") and Scotia Pacific LLC ("Scopac").[2]

Palco owned and operated a sawmill, a power plant, and the town of Scotia, California. Marathon held a secured claim against Palco's assets, which ultimately rose to about $160 million including pre- and post-petition financing. Marathon estimated Palco's assets were worth only $110 million at the date of filing.

---

[2] The other four debtors were Britt Lumber Company, Inc., a manufacturer of fencing and decking products; Scotia Inn, Inc., operator of the inn in Scotia, California; Salmon Creek, LLC, a holding company owning roughly 1,300 acres of timberland; and Scotia Development Corp., LLC, a development corporation for exploring and facilitating development opportunities with respect to commercial, industrial, and residential properties in California and Texas. These four entities and Scopac are all wholly owned by Palco.

Scopac was a Delaware special purpose entity wholly owned by Palco. In 1998, Palco transferred ownership of more than 200,000 acres of prime redwood timberland ("Timberlands") to Scopac to facilitate the sale of $867.2 million in notes secured by the Timberlands and Scopac's other assets. Pursuant to an indenture agreement, the Bank of New York represents the Noteholders in the bankruptcy cases, but certain Noteholders retained their own counsel and are named appellants. On the petition date, Scopac owed the Noteholders approximately $740 million in principal and interest on the notes. Scopac also owed $36.2 million to Bank of America on a secured line of credit with a right to payment ahead of the Noteholders.

Palco and Scopac maintained separate corporate structures but were an integrated company. One of Scopac's three directors sat on Palco's board, and the companies had the same CEO, CFO, and General Counsel for substantially all of the relevant period. Palco had the sole right to harvest Scopac's timber, which Palco then processed and sold. Scopac was to repay the Noteholders with proceeds from its sales to Palco.

The Timberlands are heavily regulated by federal and state agencies. The U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the California Department of Fish and Game vigorously administer federal and state

endangered species regulations. Any new owner of the Timberlands must obtain Regional Water Quality Control Board permits that regulate waste discharge, clean-up and abatement, and site remediation. The California Department of Forestry and Fire Protection requires a timber harvesting plan covering issues like restocking, mitigating the effects of harvesting and erosion, road maintenance and sustainable yield requirements. Under the Timberlands' conservation plan, a transfer of ownership must run the gamut of pre-approval by all of these agencies.

After a year passed without sufficient progress toward a reorganization plan, the bankruptcy court terminated the debtors' exclusivity period (11 U.S.C. § 1121) and allowed the filing of five competing proposed plans. The court approved a joint disclosure statement for the plans and expedited solicitation and voting so that a confirmation hearing could begin in early April 2008. During the extended hearing, the Debtors withdrew their plans, leaving only two. The Indenture Trustee's plan covered the assets of Scopac alone, while that proposed by Marathon and MRC, the latter entity a competitor of Palco, sought to reorganize all of the Debtors.

On June 6, the bankruptcy court held the MRC/Marathon plan confirmable but the Indenture Trustee's plan not confirmable.[3] The Indenture Trustee has not appealed the court's rejection of its plan. The MRC/Marathon plan proposed to dissolve all six entities, cancel intercompany debts, and create two new entities, Townco and Newco. Almost all of Palco's assets, including the town of Scotia, California, would be transferred to Townco. The Timberlands and assets of the sawmill would be placed in Newco. MRC and Marathon proposed to contribute $580 million to Newco to pay claims against Scopac. Marathon would also convert its $160 million senior secured claim against Palco's assets into equity, giving it full ownership of Townco, a 15% stake in Newco, and a new note for the amount of the sawmill's working capital. MRC would own the other 85% of Newco and would manage and run the company.

The plan created 12 classes, seven of which were eligible to vote,[4] and four of which contained claims against Scopac. Class 5 proposed to pay Bank of

---

[3] The court characterized the Indenture Trustee's plan as a liquidation plan, not a reorganization plan. The plan provided for a six-month period to market and sell Scopac's assets. As evidence of the plan's feasibility, the Indenture Trustee solicited a "stalking horse" bid for $603 million, but the bankruptcy court found that the bid's term sheet contained numerous contingencies. Further, even the Indenture Trustee did not accept the term sheet, which, the court found, suggested the bid's unreliability. The court also found no evidence that the bidder, were it to win, was capable of operating the Timberlands or complying with a multitude of environmental regulations.

[4] *See* 11 U.S.C. § 1126(f), (g). These sections establish, respectively, that unimpaired classes are presumed to have accepted a plan, and classes that will receive nothing are presumed to have rejected a plan.

America, the sole class member, $37.6 million, consisting of the principal ($36.2 million), accrued post-petition interest, unpaid fees, and approximately $1 million in default interest paid over 12 months, thus impairing the class.[5] Class 6 proposed to pay the Noteholders' secured claim the value of their collateral and a lien on proceeds from pending unrelated litigation against the state of California, which the parties refer to as the Headwaters Litigation.[6] Class 8 proposed to pay unsecured claims against Scopac by former employees and trade vendors not previously deemed "critical,"[7] but these amounts were exposed to ongoing litigation regarding assumption and rejection of executory contracts, thus impairing the class. Class 9 was tailored to pay Scopac's

---

[5] *See* 11 U.S.C. § 1124 (defining impairment).

[6] In 1996, Palco and its ultimate parent company agreed to sell approximately 5,600 acres of old growth redwood forest to the State of California and to the United States in exchange for approximately $300 million and 7,755 acres of adjacent timberland. California and the United States also agreed to expedite the regulatory approval process required before Palco could log certain of these lands. This agreement is called the "Headwaters Agreement." Palco and Scopac sued California and two state environmental agencies alleging breach of this agreement.

[7] Although there is no explicit code provision allowing this practice, bankruptcy courts have used various code provisions to justify otherwise illegal preferential payment of pre-petition unsecured claims to certain vendors necessary for the reorganization. *See In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) (discussing the rationale and statutory bases for this practice); *see also In re CoServ, LLC*, 273 B.R. 487, 492-95 (Bankr. N.D. Tex. 2002) (finding authority to pay critical vendors).

remaining general unsecured claims, consisting of the Noteholders' deficiency claim[8] for over $200 million with a recovery estimated as "unknown."

At least one impaired Scopac class had to vote in favor of the plan for it to be confirmable as to Scopac. 11 U.S.C. § 1129(a). Classes 5 and 8 voted for the plan. Class 6 (the Noteholders' secured claim) and Class 9 (the Noteholders' deficiency claim) voted against confirmation. To confirm its plan, MRC/Marathon had to "cram down" the plan on the dissenting classes pursuant to 11 U.S.C. §1129(b).

A central question for the confirmation cram-down was the value of the Timberlands securing the Noteholders' claim.[9] To this end, the court heard extensive valuation testimony over several days and ultimately valued the Timberlands at "not more than $510 million." The bankruptcy court concluded that $510 million was the "indubitable equivalent" of the Noteholders' secured claim on the Timberlands, *see* 11 U.S.C. §1129(b)(2)(A)(iii), and that

---

[8] The Indenture Trustee declined to elect under 11 U.S.C. § 1111(b)(2) to have the entire amount of its claim treated as a secured claim. Its claim was therefore severed into a secured claim for the value of the collateral and an unsecured claim for the difference. 11 U.S.C. § 506(a).

[9] The court also credited witness testimony that the Noteholders will receive more under the MRC/Marathon plan than under the Indenture Trustee's plan or in Chapter 7, satisfying 11 § U.S.C. 1129(a)(7).

MRC/Marathon's plan, after several minor alterations,[10] otherwise complied with Bankruptcy Code requirements.

Two months earlier, the Indenture Trustee moved for a super-priority administrative expense claim, arguing its collateral diminished in value post-petition.[11] This motion was rejected following hearings in late June and early July. For the first time, the court valued the Noteholders' non-timberland collateral at $48.7 million on the petition date. After a deduction for the Bank of America's priming lien and the Indenture Trustee's legal fees,[12] the remaining value of the Noteholders' non-timberland collateral was $3.6 million. In total, the MRC/Marathon plan offered the Noteholders $513.6 million in cash, any payments that might flow to their unsecured deficiency claim, and a retained lien on any Headwaters litigation proceeds.

---

[10] The plan established a litigation trust to pursue various causes of action on behalf of the Debtors. The court held that the proposed trust effected a substantive consolidation because it commingled potential recoveries for Palco and Scopac debtors. The court advised that the trust should either be divided into one for Palco and one for Scopac or should separately account for recovery within one trust.

[11] Courts have implied in 11 U.S.C. § 507(b) a right to a superpriority administrative claim for the diminution of value of collateral during the operation of the automatic stay (11 U.S.C. § 362). *E.g., In re Blackwood Associates, L.P.*, 153 F.3d 61, 68 (2d Cir. 1998); *In re Carpet Ctr. Leasing Co.*, 4 F.3d 940, 940 (11th Cir. 1993).

[12] *See* 11 U.S.C. §§ 503(b)(3)(D), 507(a)(2) (establishing that the legal fees of an indenture trustee making a substantial contribution to a chapter 11 case are priority unsecured claims).

On July 8, the court confirmed the modified plan and denied confirmation of the Indenture Trustee's plan. The next day, the Indenture Trustee, joined by Scopac and individual Noteholders, moved to stay confirmation of the plan pending appeal, and the Indenture Trustee moved to certify the appeal directly to this court. The bankruptcy court granted the motion to certify but denied the stay pending appeal.[13] A motions panel of this court issued an interlocutory order similarly denying the Indenture Trustee's motion to stay confirmation pending appeal.

The Indenture Trustee asserts on appeal contentions of three types: those challenging the treatment of their security interests; those challenging the plan confirmation procedures; and those relating to other specific plan terms. The issues raised are that the confirmed MRC/Marathon reorganization plan: (1) violates the absolute priority rule by paying junior Palco and Scopac creditors with the Noteholders' collateral; (2) is not "fair and equitable" because the plan sold the Timberlands collateral without providing the Noteholders a right to credit bid; (3) values the Noteholders' collateral too low and by an improper judicial process; (4) creates an illegal substantive consolidation of Scopac and

---

[13] This court has jurisdiction over this appeal directly from bankruptcy court pursuant to 28 U.S.C. § 158(d)(2) based on the certification by the bankruptcy court and this court's acquiescence therein.

Palco; (5) fails to pay inter-company administrative priority claims in cash; (6) artificially impaired the claim owed to Bank of America and illegally gerrymandered the voting classes of unsecured claims in classes 8 and 9; (7) discriminates unfairly in its treatment of the Noteholders' Class 9 deficiency claim; and (8) includes unauthorized third-party release and exculpation provisions.

On August 21, MRC/Marathon, joined by the United States and the State of California, on the basis of their respective regulatory interests, moved to dismiss this appeal as equitably moot. Because this motion logically precedes considering the merits of the appeal, we consider it first.[14]

## DISCUSSION

### A. Equitable Mootness

Appellees contend that this appeal is equitably moot and must be dismissed because no stay pending appeal of confirmation was granted; the plan is substantially consummated; and unwinding it will have an adverse effect on

---

[14] *Compare In re Continental Airlines*, 91 F.3d 553, 568-72 (*en banc*) (Alito, J., dissenting) (discussing the origin of equitable mootness doctrine and concluding that, because it is neither jurisdictional nor a question of justiciability, courts need not consider equitable mootness before the merits).

third-parties and will prevent a successful reorganization. *In re UNR Industries Inc.*, 20 F.3d 766, 769 (7th Cir. 1994).

"Equitable mootness" has evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of orders confirming reorganization plans. Equitable mootness is a kind of appellate abstention that favors the finality of reorganizations and protects the interrelated multi-party expectations on which they rest. *See In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994). Despite its apparent virtues, equitable mootness is a judicial anomaly. Federal courts "have a virtually unflagging obligation" to exercise the jurisdiction conferred on them. *Colorado River Water Conservation Dist. v. United States*, 414 U.S. 800, 817, 96 S. Ct. 1236, 1246 (1976). Although the Bankruptcy Code forbids appellate review of certain un-stayed orders[15] and restricts post-confirmation plan modifications,[16] it does not expressly limit appellate review of plan confirmation orders. Moreover, equitable mootness cannot claim legitimacy based on Article III mootness. The latter doctrine, of constitutional origin, prevents adjudication when cases are no longer "live"; the former abdicates appellate review of very real, continuing controversies. As then-Judge Alito

---

[15] 11 U.S.C. §§ 363(m), 364(e). These provisions prevent the appellate reversal of an order to sell property or obtain post-petition financing unless such orders were stayed pending appeal.

[16] 11 U.S.C. § 1127.

wrote, Article III mootness concerns arise when a judicial ruling would have no effect; equitable mootness applies when a judicial ruling might have too much effect on the parties to a confirmed reorganization. *In re Continental Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (*en banc*) (Alito, J., dissenting). *See also In re UNR Industries*, 20 F.3d 766, 769 (7th Cir. 1994) (Easterbrook, J.) (equitable mootness is a misnomer).

Nevertheless, the rationale for equitable mootness is not at issue here. The doctrine is firmly rooted in Fifth Circuit jurisprudence, as this court attempts to "strik[e] the proper balance between the equitable considerations of finality and good faith reliance on a judgment and competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him." *In re Manges*, 29 F.3d at 1039; *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008); *In re GWI PCS 1 Inc.*, 230 F.3d 788, 800 & n.24 (5th Cir. 2000); *In re Berryman Products, Inc.*, 159 F.3d 941, 944 (5th Cir. 1998). This court accordingly considers "(1) whether a stay was obtained, (2) whether the plan has been 'substantially consummated,' and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re Manges*, 29 F.3d at 1039.

It is important to observe that appellate cases generally apply equitable mootness with a scalpel rather than an axe. This court has been especially solicitous of the rights of secured creditors following confirmation. Thus, equitable mootness did not stand in the way of our reversing an order that improperly required a secured lender, as part of a reorganization plan, to reimburse environmental remediation expenses incurred by the debtor. *In re Grimland*, 243 F.3d 228, 232 (5th Cir. 2001). In an earlier case, this court reviewed whether the principal secured lender to a debtor received the "indubitable equivalent" of its interest when its lien was modified by the plan. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 409 (5th Cir. 1985). This court noted that reversal of the confirmation order would simply require reimposition of the original lien. *Id.* at 407 n.1.

This court has also conducted appellate review of plan provisions that relieved a bankruptcy trustee from liability following a confirmed plan, and has ordered attorneys to reimburse sums improperly allocated to them from secured creditors. *See In re Hilal*, 534 F.3d at 501; *In re SI Restructuring*, 542 F.3d 131, 136-37 (5th Cir. 2008). In neither of those cases had a stay been obtained, and the reorganization plans had been substantially consummated. Each opinion

14

found, however, that there would be no significant adverse consequences to the reorganization from appellate review of the particular issues.

Other courts have carefully weighed the consequences before applying equitable mootness to issues raised on appeal of plan confirmation orders. Notably, they hold that appellate review need not be declined when, because a plan has been substantially consummated, a creditor could not obtain full relief. If the appeal succeeds, the courts say, they may fashion whatever relief is practicable. After all, appellants "would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole." *In re Chateaugay Corp.*, 10 F.3d 944, 954 (2d Cir. 1993) (citing *MCI Telecommunications Corp. v. Credit Builders of America, Inc.*, 2 F.3d 103, 104 (5th Cir. 1993) ("[A] case is not mooted by the fact that an impecunious judgment debtor may lack the means to satisfy a judgment.")) *See also In re PWS Holdings* Corp., 228 F.3d 224, 236-37 (3d Cir. 2000). Another caveat is that equitable mootness applies to specific claims, not entire appeals. "In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential

15

impact on the reorganization scheme as a whole." *In re AOV Industries Inc.*, 792 F.2d 1140, 1148 (D.C. Cir. 1986).[17]

To these cautions regarding equitable mootness must finally be added the impact of the new statutory provision for certification of bankruptcy appeals directly to the courts of appeals. 28 U.S.C. § 158(d)(2). The twin purposes of the provision were to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy. H.R. Rep. No. 109-31 pt. I, at 148 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 206. Congress's purpose may be thwarted if equitable mootness is used to deprive the appellate court of jurisdiction over a properly certified appeal.

All of these factors bear on the instant appeal. Because the bankruptcy court denied a stay pending appeal, this court faced a *fait accompli*, a plan that was substantially consummated within weeks of confirmation. As we have

---

[17] Two of our decisions declining to review bankruptcy appeals on equitable mootness grounds are not to the contrary. In *In re Crystal Oil*, this court declined to impose additional, more onerous payment terms for notes issued pursuant to a substantially consummated plan. The court observed that awarding such relief on appeal would harm the first lienholder who had made significant concessions, to the benefit of the junior lienholder who was the appellant. 854 F.2d 79, 81-82 (5th Cir. 1988). Similarly, in *In re Brass Corporation*, this court declined to perform the "proposed day surgery" on a consummated Chapter 11 plan because such relief "would excise parts to which other vital[] [parts] of the plan are attached." 169 F.3d 957, 962 (5th Cir. 1999). These decisions were rooted in determinations that any relief would either harm third-parties or threaten the reorganization.

noted, plan consummation may often be dispositive of the question of equitable mootness. *In re Manges*, 29 F.3d at 1040 (quoting *In re UNR Industries Inc.*, 20 F.3d at 770 ("A stay not sought, and stay sought and denied, lead equally to the implementation of the plan of reorganization.")). Under the Bankruptcy Code, consummation includes transferring all or substantially all of the property covered by the plan, the assumption of business by the debtors' successors, and the commencement of plan distributions. 11 U.S.C. § 1141; *In re Manges*, 29 F.3d at 1041, n. 10. Within fewer than sixty days following the confirmation order, Scopac and Palco were dissolved and their assets transferred to new entities, Newco and Townco, now named Humboldt Redwood Company ("HRC") and the town of Scotia, respectively. The new entities raised $325 million in exit financing secured by HRC and guaranteed by MRC. Creditors other than the Noteholders have been paid over $50 million. HRC hired new management, changed its management structure, engaged business consultants and leased new office space and a distribution center. HRC has signed new contracts with re-manufacturers and won business from a national home products retailer. The town of Scotia invested in costly capital improvements. In addition, HRC has successfully navigated the regulatory labyrinth and secured unanimous approval to operate from the state and federal agencies. All of these events created third-party reliance and expectations that would be dislodged if the Noteholders

17

succeed in entirely reversing the confirmation order. *In re Manges*, 29 F.3d at 1043. We will further balance these facts as we analyze the specific issues raised on appeal.

But the incongruity of the bankruptcy court's actions—in both denying a stay pending appeal and certifying its orders for direct appeal to this court—requires immediate comment. Facially, the two decisions do not conflict. The court briskly dispatched the legal issues raised by the Noteholders as having no likelihood of success on appeal. It emphasized the economic calamity facing Palco and Scopac. The court doubted the feasibility of any alternate plan, given the complex and constrictive regulatory environment in which redwood logging exists. The court found that a direct appeal would materially advance the progress of the debtors' cases. *See* 28 U.S.C. § 158(d)(2)(iii). Certification was also driven by the prominence of this case to the citizens of California, of Humboldt County, and of the town of Scotia and by the plan's effect on "one of the nation's most ecologically diverse forests . . . ." Based solely on this reasoning, the court's certification decision complements the denial of the stay by speeding the case to the final disposition the court desired. Its rationale for certification is certainly sufficient under 28 U.S.C. § 158(d)(2)(i).

An alternative basis for certification also existed, however, because of the novel issues raised in the confirmation process. The court authorized cramdown

of secured debt premised solely on its judicial valuation of a 200,000-acre redwood forest, and it denied the Noteholders' right to credit bid their debt against the value of the collateral. The nature of this cramdown and the refusal to apply § 1129(b)(2)(A)(ii) to authorize a credit bid are unusual, perhaps unprecedented decisions. Such issues and others mentioned later, when considered in the context of reorganizing nearly a billion dollars total debt and over $700 million of the Noteholders' secured debt, deserved certification and an opportunity for direct appeal. *See* 28 U.S.C. § 158(d)(2)(ii).

Although the exigencies of the case appeared to demand prompt action, simply denying a stay seems to have been, and often will be, too simplistic a response. A plan may be designed to take effect, as it was here, after a lapse of sufficient time to initiate appellate review. A supersedeas bond may be tailored to the scope of the appeal. An appeal may be expedited. As with all facets of bankruptcy practice, myriad possibilities exist. Thus, substantial legal issues can and ought to be preserved for review. ***Compare In re First South Savings Ass'n*, 820 F.2d 700, 709 & n.10 (5th Cir. 1987)**.

## B.    The Indenture Trustee's Claims

### 1.    Issues Pertaining to Secured Claim.

Three of the Indenture Trustee's issues challenge what the Noteholders received for their collateral—approximately $513 million in cash—pursuant to the bankruptcy court's determination of the value of the Timberlands. According to the Noteholders, the plan violates their rights imbedded in the absolute priority rule and the fair and equitable standard governing the treatment of claims in chapter 11 reorganizations. *See generally* 11 U.S.C. § 1129(a), (b). Alternatively, the Noteholders challenge the methodology and amount reached in the court's valuation of the Timberlands.

We hold these issues justiciable notwithstanding the tug of equitable mootness. Secured credit represents property rights that ultimately find a minimum level of protection in the takings and due process clauses of the Constitution.[18]  The Bankruptcy Code's reorganization provisions in fact "preserve the essence" of the boundaries of secured creditors' rights laid out in constitutional cases. *See* Kenneth N. Klee, Bankruptcy and the Supreme Court 139 (2008).  Federal courts should proceed with caution before declining

---

[18] *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-90, 55 S. Ct. 854, 863 (1935) (takings clause); *Wright v. Vinton Branch of the Mountain Trust Bank*, 300 U.S. 440, 470, 57 S. Ct. 556, 565 (1937) (due process clause); *Dewsnup v. Timm*, 502 U.S. 410, 418-19, 112 S. Ct. 773, 779 (1992) (citing *Radford* with approval).

appellate review of the adjudication of these rights under a judge-created abstention doctrine. Moreover, while we have found no case that applied equitable mootness to decline review of the treatment of a secured creditor's claim, at least two cases in this court have ruled on such appeals despite plan proponents' pleas for equitable mootness. *In re Grimland*, 243 F.3d 228, 232 (5th Cir. 2001); *In re Sun Country Dev. Inc.*, 764 F.2d 406, 409 (5th Cir. 1985). Only a year before *Manges* issued, we reviewed all issues pertaining to a cramdown reorganization plan without any concerns being voiced about equitable mootness. *Matter of Briscoe Enterp. Ltd., II*, 994 F.2d 1160 (5th Cir. 1993).

Nor is it inconsistent with *In re Manges* to review the Noteholders' challenges regarding the treatment of their secured claims. Despite the substantial consummation of the MRC/Marathon plan, or rather, because of it, over $500 million in cash was escrowed to pay the Noteholders. If we were to reverse the bankruptcy court's decision, the cash would revert to some other use for the benefit of the reorganized company. We need not invent hypotheticals to suggest that the expectations of third parties other than MRC/Marathon could largely be preserved despite a decision reinstating or re-evaluating the Noteholders' liens. Alternatively, some other, more limited form of relief might

21

be afforded the Noteholders. *See In re Chateaugay*, 10 F.3d at 954. That there might be adverse consequences to MRC/Marathon is not only a natural result of any ordinary appeal—one side goes away disappointed—but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation and valuation rules.[19] Finally, the complexity of cramdown often cries out for appellate review, and this "should encourage the debtor to bargain with creditors to gain acceptance of a plan in the majority of cases." Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133, 171 (1979).

Turning to the merits, the Bankruptcy Code requires a reorganization plan either to rest on the agreement of each class of creditors or to protect creditor classes according to the absolute priority rule, which enforces a strict hierarchy of their rights defined by state and federal law. The absolute priority rule has long been a feature of American bankruptcy law. It is codified in the standard that a plan be "fair and equitable, with respect to each class of claims of interest

---

[19] Equitable mootness should protect legitimate expectations of parties to bankruptcy cases but should not be a shield for sharp or unauthorized practices. Applying equitable mootness too broadly to disfavor appeals challenging the treatment of secured debt carries a price. It may promote the confirmation of reorganization plans, but it also destabilizes the credit market for financially troubled companies. Lenders will be reluctant to work with debtors who may unilaterally decide to file bankruptcy, propose a plan that aggressively undervalues the collateral, and may then thwart appellate review by rotely incanting equitable mootness. On the whole, it is preferable to create an environment in which firms can avoid bankruptcy rather than one in which bankruptcy litigiousness will thrive.

that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b).[20]

The absolute priority rule and the fair and equitable standard must both be satisfied before a court may "cram down" a reorganization plan over the objection of a dissenting creditor class.

The Noteholders initially contend that the MRC/Marathon plan violates absolute priority by directing some of the capital injected by MRC and Marathon to pay claims junior to the Noteholders' secured claim.  This argument has two components.  The first is rooted in valuation.  If the bankruptcy court's valuation of the Noteholders' collateral aligned with their valuation, and if the plan paid them that amount, the Noteholders would not complain.  It is only because they perceive a valuation shortfall that they contend more of the purchase price of the assets should have been paid for their collateral and was improperly used to pay junior creditors.  This valuation issue will be addressed further below.

The second component of the Noteholders' absolute priority objection is based on the fair and equitable standard as applied to secured creditors.  To be fair and equitable with respect to a dissenting class, a plan must "include" certain requirements.  11 U.S.C. § 1129(b)(2)(A).  Three minimum alternatives

---

[20] The absolute priority rule provides that "a plan of reorganization may not allocate any property whatsoever to any junior class on account of their interests or claims in a debtor unless such senior classes receive property equal in value to the full amount of their allowed claims. . . ."  7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1129.04[4][a], at 1192-93 (15th ed. rev. 2008).

are provided for secured creditors. Under the first alternative, the holders may retain their liens accompanied by the right to receive deferred cash payments having a present value equal to the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i) ("Clause (i)"). Second, the secured property may be sold free and clear of liens, with the liens attaching to the proceeds, as long as the creditor has the right to credit bid pursuant to 11 U.S.C. § 363(k). 11 U.S.C. § 1129(b)(2)(A)(ii) ("Clause (ii)"). Third, the plan may allow for the "realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii) ("Clause (iii)").

In this case, the bankruptcy court held that Clause (ii), governing sales free and clear, is inapplicable because the reorganization plan constitutes a "transfer" rather than a "sale" of assets. *See* 11 U.S.C. § 1123(a)(5)(B) and (D). We agree with the Noteholders that this ruling was wrong. MRC, a competitor of Palco, joined with Palco's creditor Marathon to offer cash and convert debt into equity in return for taking over both Palco and Scopac. New entities wholly owned by MRC and Marathon received title to the assets in exchange for this purchase. That the transaction is complex does not fundamentally alter that it involved a "sale" of the Noteholders' collateral. *See Black's Law Dictionary* 1337 (7th ed. 1999). Section 1123(a)(5), cited by the court, lists "transfers" and "sales" among various devices a debtor may employ to accomplish reorganization, and

24

"transfer" is defined broadly in 11 U.S.C. § 101(54). The terms used in these provisions are descriptive and have no independent legal significance. Further, as the Noteholders point out, every sale of property involves a transfer, but not every transfer is a sale. Here, a sale occurred. Clause (ii) could have applied.

The Noteholders, however, must do more than show that Clause (ii) theoretically applied to this transaction. They have to demonstrate its exclusive applicability. They observe that Clause (ii) alone concerns sales of collateral under a plan and specifically allows the dissenting creditor to credit bid for the collateral. Consequently, they contend, Clause (ii) should prevail under the canon of statutory construction that the more specific provision controls over the general indubitable equivalent alternative of Clause (iii). Allowing sales of collateral free and clear of liens under Clause (iii) would also, in their view, render Clause (ii) superfluous.

For several reasons, the Noteholders' arguments cannot be accepted. This court has subscribed to the obvious proposition that because the three subsections of § 1129(b)(2)(A) are joined by the disjunctive "or," they are alternatives. *Briscoe,* 994 F.2d at 1168. In *Briscoe*, the court added that it had "not transformed the 'or' in 1129(b)(2)(A) into an 'and.'" *Id.* As alternatives, these provisions are not even exhaustive. The introduction to § 1129(b)(2) states that the "condition that a plan be fair and equitable *includes* the following

25

requirements. . . ." (emphasis added). The Bankruptcy Code specifies that the term "includes" "is not limiting." 11 U.S.C. § 102(3). Even a plan compliant with these alternative minimum standards is not necessarily fair and equitable. *Matter of Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 *reh'g denied*, 889 F.2d 663 (5th Cir. 1989). The non-exhaustive nature of the three subsections is inconsistent with treating them as compartmentalized alternatives. Finally, Clause (iii) does not render Clause (ii) superfluous facially or as applied to the MRC/Marathon plan. Although a credit bid option might render Clause (ii) imperative in some cases, it is unnecessary here because the plan offered a cash payment to the Noteholders. Clause (iii) thus affords a distinct basis for confirming a plan if it offered the Noteholders the "realization . . . of the indubitable equivalent of such claims."

The question then becomes how to define Clause (iii) and whether the MRC/Marathon plan satisfies the definition. To begin, "such claims" are the creditors' allowed secured claims, which, according to the statute, equal the value of the collateral. 11 U.S.C. § 506(a); *see also*, *Matter of Sandy Ridge*, 881 F.2d at 1350.[21] What measures constitute the indubitable equivalent of the

---

[21] Section 506(a) bifurcates secured debt into an allowed secured claim equaling the value of the underlying collateral and a general unsecured claim for any deficiency. A creditor may elect in certain circumstances to treat an entire debt as secured in connection with a plan of reorganization. *See* 11 U.S.C. § 1111(b). The Noteholders made no such election here.

value of the Noteholders' collateral are rarely explained in caselaw, because most contested reorganization plans follow familiar paths outlined in Clauses (i) and (ii). One eminent author concluded from the legislative history that

> Abandonment of the collateral to the class would satisfy [indubitable equivalent], as would a replacement lien on similar collateral. But present cash payments to the class less than the amount of the allowed secured claims would not satisfy the standard. Nor are unsecured notes or equity securities sufficient to constitute the "indubitable equivalent" of secured claims.

Kenneth N. Klee, All You Ever Wanted to Know About Cram Down under the Bankruptcy Code, *supra* at 156. *See also Matter of Sandy Ridge*, 881 F.2d 1352 (affirming "dirt for debt" plan offering return of collateral in satisfaction of lender's secured claim as a possible Clause (iii) plan). Likewise insufficient is a debtor's offer to repay the balance of a secured debt in a balloon payment ten years after confirmation with interim interest payments but no requirements to protect the collateral. *In re Murel Holding Co.*, 75 F.2d 941, 942 (2d Cir. 1935). Judge Learned Hand coined the term "indubitable equivalent" in explaining why the reorganization plan in *Murel* could not be confirmed over the secured creditors' objection:

> [A] creditor who fears the safety of his principal will scarcely be content with [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that . . . unless by a substitute of the most indubitable equivalence.

*Id. See also In re Sun Country*, 764 F.2d at 409 (ruling that 21 notes secured by 21 different lots was indubitable equivalent of value lien on the entire parcel).

Based on these examples, Congress did not adopt indubitable equivalent as a capacious but empty semantic vessel. Quite the contrary, these examples focus on what is really at stake in secured credit: repayment of principal and the time value of money. Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors' collateral value and the time value compensating for the risk and delay of repayment. Indubitable equivalent is therefore no less demanding a standard than its companions. The MRC/Marathon Clause (iii) plan obviated both of the bases for protection by offering cash allegedly equal to the value of the Timberlands. No need arose to afford collateral or compensate for delay in repayment. Whatever uncertainties exist about indubitable equivalent, paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the Noteholders' collateral.

The Noteholders nevertheless protest that the plan, by depriving them of the right to credit bid and presumably foreclose on the Timberlands, failed to afford them the indubitable equivalent because they forfeited the possibility of later increases in the collateral's value. The Bankruptcy Code, however, does not protect a secured creditor's upside potential; it protects the "allowed secured claim." If a creditor were over-secured, it could not demand to keep its collateral

rather than be paid in full simply to protect the "upside potential." Further, indubitable equivalence does not require more protection than is afforded by the preceding clauses in § 1129(b)(2)(A). In this connection, MRC/Marathon could have confirmed a plan under Clause (i) that offered a stream of future payments to the Noteholders yielding the present value of their collateral and then paid off the note one day after the plan was confirmed. Just as the Noteholders would have no statutory complaint against that treatment,[22] so they cannot support a statutory argument that they are entitled to better treatment under Clause (iii).

The Noteholders' claimed right to credit bid embraces their additional disagreement with the bankruptcy court's decision to value the Timberlands judicially rather than through a public auction. They attempt to extrapolate support from the Supreme Court's decision in *Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 119 S. Ct. 1411 (1998). In *LaSalle Street*, the Court held the absolute priority rule was violated when a bankruptcy court confirmed a plan permitting a debtor's shareholders to retain control "on account of" "new value" capital contributions to the debtor. The Court held that "some form of market valuation" is necessary before former

---

[22] The Noteholders parry this point with the assertion that if the plan had rested on a Clause (i) payment stream, they could have insisted, with a § 1111(b)(2) election, that the total payments equal their total debt of over $700 million. This is true, but the present value of the payment stream is still capped by Clause (i) at the collateral value assessed by the court.

shareholders may circumvent the absolute priority rule. We agree that *LaSalle Street* encourages bankruptcy courts to be wary of the shortcomings of judicial valuation proceedings, but the case is factually distinguishable from this one.

We need not take a position on *LaSalle Street,* however, because the procedural history of this case contradicts the Noteholders' position. They have not challenged on appeal the court's finding that they will receive more value under the MRC/Marathon plan than they could have received in a liquidation, which would have led to a foreclosure auction. They do not challenge the court's finding that the Timberlands were marketed thoroughly to the public before and during the bankruptcy case. The Noteholders complain that adequate marketing was impossible because of the speed of the confirmation process and the court's decision to lift exclusivity only for the sake of specific parties, yet they assented to both orders. Six months elapsed between the lifting of exclusivity and confirmation of the plan, while the confirmation hearing itself spanned three months. The fact is that many entities felt called to express an interest in purchasing the Timberlands, but none was willing to submit a firm offer. The Noteholders have not established a predicate for their auction complaint—either by preserving a timely objection to the court's procedures or by a showing of prejudice.

The final stage in the Noteholders' objection to the treatment of their secured claim is the court's valuation decision, which yielded them net cash of approximately $513.6 million. Their briefing, oddly, dwells more on the alleged inherent shortcomings of the valuation process than on the bankruptcy court's final result. With the exception of collateral that may have been left out of the valuation, the court's result is not clearly wrong. The valuation hearing was extensive. The court heard testimony from eight valuation experts. Three of these experts provided testimony on the characteristics of the Timberlands, and four provided ultimate estimates of the value of the approximately 200,000-acre stand of timberland.[23] MRC/Marathon's expert is a timberland appraiser with extensive experience. Using two standard appraisal methods, the income approach and the comparable sales approach, he testified the Timberlands were worth $430 million or $425 million, respectively. Given the expert's experience and his method, the bankruptcy court gave his testimony significant weight.

The Indenture Trustee tendered two valuation experts. The first valued the timberlands at $605 million and the second at $575-$605 million. The court found the first analysis had significant flaws including the chosen start date, the

_____

[23] One expert valued only six parcels of land called the Marbled Murrelet Conservation Areas (MMCAs). These approximately 6,600 acres were part of the Headwaters Agreement, and timber harvesting is essentially forbidden on them for the next 40 years.

31

valuation method, the failure to account for recent declines in redwood and Douglas fir prices, and the lack of specificity in the analysis. The second appraisal was also suspect. The witness's testimony contradicted earlier testimony offered by another expert at his firm. The court also found the expert's firm prepared the report for him and essentially ordered him to testify. Further, when questioned, the expert undermined his analytical methodology by conceding that he had never seen preliminary bids employed in a valuation analysis other than this one.

The Indenture Trustee's appeal relies heavily on several third-party offers to purchase the Timberlands for more than $510 million. This is persuasive market evidence, it claims, that the bankruptcy court's valuation was clearly too low. The bankruptcy court found, however, that these bids were either unreliable or too tentative to consider. By the Indenture Trustee's own admission, it had been soliciting offers for the Timberlands "all along." That no firm bid was submitted during this period shows that the Indenture Trustee's proposed valuation was too high. Scopac also tendered an expert who valued the Timberlands at approximately $940 million, but the court discounted this appraisal because the pricing data and assumptions on price increase were too high and overly optimistic.

Ultimately, the court adjusted MRC/Marathon's appraisal upward and the Indenture Trustee's downward and arrived at a valuation of $510 million. This represents a reasonable accommodation of complex and sometimes contradictory testimony. The Noteholders have made little effort to prove a clear error. What we have said before remains true: "Although we recognize that valuation is not an exact science, it remains an integral part of the bankruptcy process." *Matter of Sandy Ridge*, 881 F.2d at 1354.[24]

We conclude that the MRC/Marathon plan, insofar as it paid the Noteholders the allowed amount of their secured claim, did not violate the absolute priority rule, was fair and equitable, satisfies 11 U.S.C. § 1129(b)(2)(A)(iii), and yielded a fair value of the Noteholders' secured claim.

---

[24] The Indenture Trustee also asserts that the bankruptcy court necessarily failed to provide the Noteholders with the indubitable equivalent value of property secured by their lien because it did not value the non-timberland collateral. This is incorrect. The bankruptcy court expressly valued the Noteholders non-timberland collateral at $48.7 million, an amount representing cash and cash equivalents in Scopac's accounts on the petition date. After subtracting the Bank of America's priming lien and the Indenture Trustee's legal fees, the net value of the non-timberland collateral was $3.6 million. The court added this amount to its prior timberland valuation of $510 million, and the sum represented the total value of collateral secured by the Noteholders' lien.

Against these findings, the Indenture Trustee asserts in its principal brief that its security interests in "personal property covered by the Uniform Commercial Code" and "any goods or any other personal property that may not or hereafter become fixtures," were left out of valuation. In its reply brief, it describes the omitted property as "plant and equipment, and non-timberland real property." These vague and contradictory assertions are insufficient to raise an intelligible appellate point.

## 2. De Facto Substantive Consolidation

Although the bankruptcy court found that the MRC/Marathon plan does not effect a substantive consolidation, the Indenture Trustee challenges this holding. Substantive consolidation is an "extreme and unusual remedy." *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002). Substantive consolidation may take multiple forms, but "it usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the two companies for the purposes of voting on reorganization plans." *In re The Babcock and Wilcox Co.*, 250 F.3d 955, 958-59 n.5 (5th Cir. 2001) (quoting *In re Augie/Restiveo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988). There are some justifications for substantive consolidation, *see* 2 Lawrence P. King et al., Collier on Bankruptcy § 105.09[2] (15th ed. rev. 2009), but here, the Indenture Trustee claims the confirmed plan resulted in substantive consolidation without the bankruptcy court's providing any justification or following the proper procedures. *See In re The Babcock and Wilcox Co.*, 250 F.3d at 958 (characterizing de facto substantive consolidation).

We are mindful of the Indenture Trustee's concerns, especially in a case involving securitized lending through a bankruptcy-remote special purpose

entity like Scopac.[25] The Indenture Trustee's argument fails, however, to prove that substantive consolidation occurred here. Its allegations that unsecured Palco claims were paid with Scopac assets subject to its lien have been addressed and rejected above. Its only other evidence of substantive consolidation is based on the erroneous contention that the plan commingled inter-company administrative claims. Because these contentions are easily disposed of, we need not consider whether this claim is equitably moot.

### 3. Unpaid Inter-company Administrative Priority Claim

During the bankruptcy proceedings, the Debtors agreed that Scopac would hold logs for Palco at their log deck, subject to certain conditions, because Palco did not have the cash to keep purchasing logs. The Indenture Trustee argues that, on the confirmation date, Scopac had an approximately $11 million post-petition administrative claim against Palco for unpaid log deliveries. Under 11 U.S.C. § 1129(a)(9)(A), this administrative expense must be paid in cash at

---

[25] Substantive consolidation is of special concern in cases involving special purpose entities like Scopac. Special purpose entities are often used in securitized lending because they are bankruptcy-remote, that is, they decrease the likelihood that the originator's financial trouble will affect the special purpose entity's assets serving as collateral for the notes. Nevertheless, there is a danger that a court will substantively consolidate the two entities, using the value of the investors' collateral to satisfy the originator's debts. If courts are not wary about substantive consolidation of special purpose entities, investors will grow less confident in the value of the collateral securing their loans; the practice of securitization, a powerful engine for generating capital, will become less useful; and the cost of capital will increase.

the time of confirmation. Because awarding relief on the full $11 million would seem not to imperil a reorganization involving hundreds of millions of dollars, the bankruptcy court would be able to award effective relief either with an appropriate lien in the Noteholders' favor or a cash payment. *See In re Chateaugay*, 10 F.3d at 954 (ruling that the possibility of fractional recovery was sufficient to avoid finding the appeal of a confirmation plan entirely moot). This claim is not equitably moot.

The Indenture Trustee first asserts that certain plan provisions impermissibly merged the treatment of pre- and post-petition claims and failed to promise full payment of all administrative claims, including the $11.1 million account receivable for the log inventory. This is incorrect; the plan provisions facially comply with the Bankruptcy Code, as the court concluded.

It is not certain, however, whether the court accounted for the $11.1 million account receivable when it valued the Noteholders' post-petition collateral. The ultimate $513.6 million valuation reflects the Noteholders' security interest in the Timberlands and cash and cash equivalents as of the petition date. Contrary to the assertion of MRC/Marathon, the exhibit the court used to arrive at the value of Scopac's cash on hand on the petition date itemizes the $11.1 million in net accounts receivable Scopac had in May 2008 and segregates that amount from the court's starting point of $48.7 million. How

36

much of the $11.1 million receivable consists of unpaid log deliveries is unstated, but a note to this exhibit indicates that accounts receivable are no longer being collected from Palco. The court may have made a mathematical error and deprived the Noteholders of this post-petition administrative priority claim.

Therefore, we remand for a determination of the value of this administrative priority claim and the extent to which effective relief is available.

### 4. Artificial Impairment of Class 5 Claim and Gerrymandering of Unsecured Claims in Classes 8 and 9

The Noteholders raise significant objections to the plan's treatment of the Bank of America's claim in Class 5 and its division of unsecured claims with equal legal status into two voting classes, 8 and 9. An affirmative majority vote, in number and amount, of at least one class of "impaired" claims was necessary to confirm a cramdown plan. 11 U.S.C. § 1129(a)(10).

The Noteholders object that the Bank of America senior secured claim was artificially impaired because the plan needlessly deferred payment of approximately $1 million in default interest in installments over the course of a year. Because it was receiving the balance of its claim in cash at confirmation, Bank of America voted to confirm the plan. Despite the apparent arbitrariness of this impairment from a business standpoint, the bankruptcy court approved the classification.

The bifurcation of unsecured "trade" claims and the Noteholders' deficiency claim is even more troubling. Class 8 includes, *inter alia*, trade claims of vendors not previously deemed "critical" and claims by former Scopac employees. Class 9 is the Noteholders' deficiency claim. Legally, these unsecured claims are on equal footing. The bankruptcy court's findings that Class 8 claims are necessary to sustain the reorganization are odd. Under the Bankruptcy Code, classes must contain "substantially similar" claims, but similar claims can be separated into different classes for "good business reasons." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991). Permissible justifications vary with circumstances, but "[i]n many bankruptcies, the proffered reasons . . . will be insufficient to warrant separate classification." *Matter of Briscoe*, 994 F.2d at 1167. Facilitating a plan's confirmation is definitely not a valid justification. As this court has held, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on reorganization." *Greystone*, 995 F.2d at 1279.

Nonetheless, we must hold these impairment and classification contentions equitably moot. Because the plan has been substantially consummated, the smaller unsecured creditors —irrespective of their status vis à vis the reorganized companies—have received payment for their claims. Third-party expectations cannot reasonably be undone, and no remedy for the

Noteholders' contentions is practicable other than unwinding the plan. These contentions are not remediable on appeal.

**5. Unfair Discrimination against Noteholders' Unsecured Deficiency Claim**

A cramdown plan must not discriminate unfairly between claims of equal legal priority. 11 U.S.C. § 1129(b)(1). The MRC/Marathon Plan treats unsecured claims in Classes 8 and 9 radically differently. The Class 8 creditors have received approximately 75-90% of their unsecured claims, while the Noteholders' Class 9 deficiency claim, relegated to speculative returns from pending litigation, will probably receive nothing. The bankruptcy court purported to justify the difference based on the supposed essential nature of Class 8 creditors' services to the reorganized company.

As with the preceding complaints about claim impairment and classification, we are bound, if equitable mootness means anything, for the reasons just stated to decline appellate review of this issue.

**6. Legality of Non-Debtor Exculpation and Release Clause**

The plan releases MRC, Marathon, Newco, Townco, and the Unsecured Creditors' Committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing, and administering the plan. The law states, however, that "discharge of a debt of

the debtor does not affect the liability of any other entity on . . . such debt."
11 U.S.C. § 524(e).

Preliminarily, this claim is not equitably moot. "[E]quity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). MRC/Marathon insist the release clause is part of their bargain because without the clause neither company would have been willing to provide the plan's financing. Nothing in the record suggests that MRC/Marathon, the Committee, or the Debtors' officers and directors were co-liable for the Debtors' pre-petition debts. Instead, the bargain the proponents claim to have purchased is exculpation from any negligence that occurred during the course of the bankruptcy. Any costs the released parties might incur defending against suits alleging such negligence are unlikely to swamp either these parties or the consummated reorganization.[26] In short, the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process. We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization. In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third

---

[26] Because the Noteholders do not brief why Newco and Townco (or their officers and directors) should not be released, we do not analyze their position.

parties. *See, e.g.*, *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993); *Zale Corporation v. Feld*, 62 F.3d 746 (5th Cir. 1995). These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions.[27]

MRC/Marathon suggest we adopt a more lenient approach to non-debtor releases taken by other courts. *See SEC v. Drexel Burnham Lambert Group*, 960 F.2d 285, 293 (2d Cir. 1992); *In re A.H. Robbins*, 880 F.2d 694, 701 (4th Cir. 1991). Besides conflicting with *Zale Corp. v. Feld*, these cases all concerned global settlements of mass claims against the debtors and co-liable parties. *See In re Continental Airlines*, 203 F.3d 203, 212-213 (3d Cir. 2000) (surveying circuit law on non-debtor releases). In fact, the Bankruptcy Code now permits bankruptcy courts to enjoin third-party asbestos claims under certain

---

[27] Two cases cast doubt on this categorical prohibition against non-debtor releases, but these cases are distinguishable because they concern the *res judicata* effect of non-debtor releases, not their legality. In *Republic Supply Company v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987), this court ruled that *res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation. The current case is distinguishable because it presents an appeal of a confirmation order, not a separate action, barred by the exculpation provision, collaterally attacking the legality of the release. This court's opinion in *Applewood Chair Co. v. Three Rivers Planning & Development District*, 203 F.3d 914, distinguishes *Shoaf* by holding that the release at issue there was not specific. *Applewood* did not find specific releases satisfy § 524(e), instead it held that this court would only give res judicata effect to specific clauses.

circumstances, 11 U.S.C. § 524(g), which suggests non-debtor releases are most appropriate as a method to channel mass claims toward a specific pool of assets. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988) (describing channeling function).

There are no allegations in this record that either MRC/Marathon or their or the Debtors' officers or directors were jointly liable for any of Palco's or Scopac's pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

We agree, however, with courts that have held that 11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (citing *In re L.F. Rothschild Holdings, Inc.*, 163 B.R. 45, 49 (S.D.N.Y. 1994); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992)). *See also* 7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1103.05 [4][b] (15th ed. rev. 2008) ("[A]ctions against committee members in their capacity as such should be discouraged. If

members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee."). The Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here. The scope of protection, which does not insulate them from willfulness and gross negligence, is adequate.

Consequently, the non-debtor releases must be struck except with respect to the Creditors Committee and its members.

## CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent herewith.