# In the
# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 03-3877

SARAH E. FREY, KEVIN ENRIGHT,
and PROTECT OUR WOODS, INC.,

*Plaintiffs-Appellants*,

*v.*

ENVIRONMENTAL PROTECTION AGENCY,
STEPHEN L. JOHNSON, Acting
Administrator, and VIACOM, INC.,

*Defendants-Appellees.*

―――――――――

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 00-0660-C-Y/F—**Richard L. Young**, *Judge.*

―――――――――

ARGUED MAY 25, 2004—DECIDED APRIL 6, 2005

―――――――――


Before EASTERBROOK, WOOD, and WILLIAMS, *Circuit
Judges.*

WOOD, *Circuit Judge.* In this successive appeal, we con-
front another chapter in the long history of certain
Superfund sites located near Bloomington, Indiana. The sites
are contaminated with polychlorinated biphenyls (PCBs),
dioxin, and other toxic chemicals. Sarah Frey, Kevin Enright,
and the organization Protect Our Woods (to whom we refer

collectively as "Frey") are before us once again, trying to invoke the citizen suit provision of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). That law, in general, permits a plaintiff to challenge cleanup efforts at Superfund sites once the Environmental Protection Agency (EPA) and other responsible parties proclaim their work to be completed. 42 U.S.C. § 9613(h)(4); *Frey v. EPA*, 270 F.3d 1129, 1133 (7th Cir. 2001) (*Frey I*). Frey argues that her suit meets the statutory criteria, because EPA has completed the excavation of PCBs and has not yet selected further remedies. The district court saw matters differently; it found that Frey's action was (still) premature because EPA has made it clear that it is studying further cleanup options for the three sites challenged in this lawsuit: Lemon Lane Landfill, Neal's Landfill, and Bennett's Dump. We conclude, however, that because EPA has failed to provide any objective referent by which to measure its progress, Frey is finally entitled to her day in court. We reverse.

# I

On January 4, 1983, the United States initiated a civil action under CERCLA, 42 U.S.C. §§ 9601 *et seq.*, against Viacom (formerly the Westinghouse Electric Corporation and then the CBS Corporation, until it merged into Viacom) to clean up two PCB contaminated dump sites in Bloomington, Indiana. After the City of Bloomington sued Viacom in connection with two other contaminated sites, the cases were consolidated and an additional two sites were added, bringing the total to six. In 1985, the parties entered into a consent decree that directed Viacom to excavate fully (meaning literally down to bedrock) and incinerate the PCBs at the six sites. This plan proved to be controversial, because it required Viacom to construct an incinerator. In 1988, Frey filed suit to challenge the proposed incineration remedy; we

dismissed that action for lack of subject matter jurisdiction. *Schalk v. Reilly*, 900 F.2d 1091, 1096-97 (7th Cir. 1990).

Although Frey's lawsuit was unsuccessful, the Indiana State Legislature acted in 1991 to block construction of the incinerator. This forced the parties to the consent decree into further negotiations to find alternative remedies for the contaminated sites. In the course of these discussions, EPA and Viacom came to an impasse. Viacom believed that it should be required only to excavate highly contaminated soil (known as "hot spots"), while EPA took the position that hot spots excavation would be appropriate only if water treatment and sediment removal were included as part of the alternative remedy. In 1997, the district court issued an order stating that the sites had to be remediated by 1999.

To assist the parties in breaking the deadlock in time for the 1999 deadline, the court appointed a special master "to see that the aims of the consent decree are carried out expeditiously and to resolve possible disputes between the parties." The special master's report recommended that the remediation deadline be moved back one year to 2000. It noted that the parties had reached agreement on some alternative methods of PCB excavation and that they had also agreed to complete the source control (excavation) work by the end of 2000. While the excavation work was underway, Viacom agreed to investigate water treatment and sediment remediation solutions at the three sites. According to the schedule proposed by the special master, the parties were to "engage in further settlement negotiations regarding water treatment and sediment removal aspects of remediation at Neal's Landfill and Lemon Lane Landfill, including negotiations for permanent water treatment solutions for these sites, approximately one year following the completion of source control activities at each site." The district court adopted the special master's report and recommendations on February 1, 1999, noting in its order that the schedule required that excavation work at Neal's Landfill and

Bennett's Dump be completed by the end of 1999 and that the work at Lemon Landfill be completed by the end of 2000. It instructed the parties to engage in further settlement negotiations regarding the water treatment and sediment removal phases of the remediation.

After the incinerator option was abandoned, EPA took steps to select a new source control remedy for excavation of PCBs at the three sites. The National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Pt. 300, establishes the criteria and procedures to be followed in comparing remedial alternatives and choosing a response. This regulatory process requires EPA to develop a list of effective remedial alternatives and to assess their feasibility. *Id.* at § 300.430(d) & (e) (describing the Remedial Investigation/Feasibility Study phase). After each alternative is evaluated against nine established criteria, EPA selects a preferred remedy and presents it to the public in a proposed plan for review and comment. Following a period of public comment, including the possibility of a public meeting, EPA selects a final remedy and memorializes it in a public document called a Record of Decision (ROD). *Id.* at § 300.430(f)(3)(F).

On March 29, 1999, EPA issued an amendment of the ROD for the "source control operable unit" for Neal's Landfill. This document explained that the original remedy for Neal's Landfill called for the excavation of 320,000 cubic yards of PCB contaminated landfill material and treatment through construction of an approved waste-fired incinerator. The modified remedy called for the excavation and removal of material with a high level contamination (the hot spots) to be followed by the construction of a landfill cap. Prior to adopting the hot spots excavation remedy, EPA considered alternatives, including the total excavation of the landfill. It concluded that the hot spots remedy was superior to total excavation in light of the nine regulatory criteria. As required by the regulations, EPA took public

comment and held a hearing in Bloomington on the pro-posed remedies. This ROD Amendment dealt only with the source control component. It stipulated that "[s]ubsequent actions are planned to address fully the principal threats posed by this site. Future remedial decisions will be made regarding additional interim and final water treatment and sediment removal."

On May 12, 2000, EPA issued a ROD Amendment for Lemon Lane Landfill. EPA again adopted the hot spots excavation technique for PCB removal after considering other alternatives, including total excavation. It explained that the new ROD Amendment "only addresses source con-trol measures, and future remedial decisions will be made regarding treatment of contaminated groundwater . . . ."

When Frey brought the present suit, the materials we have been discussing were presented to the district court. EPA also offered an affidavit and testimony from Thomas Alcamo, the Remedial Project Manager responsible for di-recting and overseeing the cleanup activities at the three sites. Alcamo also oversaw the development of the specific remedial approaches adopted by EPA. Alcamo's affidavit establishes that water and sediment investigations are "in progress" at all three sites. He confirmed that all of the work in connection with the bureaucratically dubbed "source con-trol operable unit" at Neal's Landfill was completed in November 1999, including the excavation and off-site dis-posal of 41,747 tons of PCB contaminated material. He further explained that, pursuant to the 1985 consent decree, Viacom had constructed a water treatment plant at Neal's Landfill that became operational in 1990. EPA was still "evaluating the need based upon risk for expanding the Viacom water treatment plan including increasing the vol-ume of spring water to be captured and treated, storage of storm water and adding additional water processing equip-ment to decrease the PCB concentrations in the effluent." He also indicated that EPA was "concurrently evaluating

based upon risk to both human and ecological receptors the need to remove PCB contaminated sediments from [surrounding creeks]."

Turning to Lemon Lane Landfill, Alcamo's affidavit represented that the "source control operable unit" corresponding to that site was completed in November 2000. It involved the excavation and off-site disposal of 80,096 tons of PCB contaminated material. After EPA determined that the landfill had contaminated the Illinois Central Spring (ICS), EPA funded the construction of an interim water treatment plant that became operational in May 2000. With respect to what Alcamo described as the water operable unit, he said that EPA was still "evaluating the need to increase storm water storage, the need to add additional process equipment based upon discharge criteria developed by the Indiana Department of Environmental Management to reduce the PCBs from the water treatment plant effluent, the need based upon risk to human and ecological receptors to treat additional springs near the Lemon Lane site, and the ability to capture and treat PCB contaminated water closer to the Lemon Lane site." As with Neal's Landfill, EPA is concurrently evaluating the need to remove PCB contaminated sediments from nearby streambeds.

The soil and excavation activities at Bennett's Dump, which involved excavation and off-site disposal of 36,157 tons of PCB contaminated material, were completed in November 1999. Although contaminated sediment was removed from the banks of a nearby creek, EPA discovered that PCBs have continued to leak from the site into an adjacent creek. Alcamo stated that "Viacom is implementing a groundwater investigation plan to allow EPA to better understand the site's hydrology," and that EPA intended to take further action once Viacom gives it whatever information the new investigation reveals. Alcamo testified that groundwater investigations generally take a longer period of time than excavation activities.

Dorothy Alke serves as the Project Manager for Viacom's cleanup efforts in Bloomington. According to Alke, when the parties to the consent decree considered alternative excavation remedies, EPA had not yet decided on water treatment or sediment remedies for the three sites. At this time, Viacom and EPA disputed Viacom's liability for various cleanup costs. This impasse was resolved by the special master's report, and Viacom then implemented the negotiated excavation remedies at the three sites. Alke claimed that when EPA first proposed the concept of additional water treatment, Viacom was willing to investigate and negotiate about such remedies, and to consider including them as part of an overall solution. She confirmed that Viacom was undertaking a series of groundwater investigations.

The record establishes that the hot spots were excavated at Neal's Landfill by November 1999 and at Lemon Lane Landfill by November 2000. PCB contaminated soils and sediments were excavated from Bennett's Dump in the fall of 1999, and again in September 2000. Water and sediment contamination has not yet been fully addressed at any of the sites, although investigation and testing continue. Frey is before us again, alleging that the excavation remedy selected by EPA has failed to bring the sites into compliance with CERCLA and other environmental statutes. Her ability to litigate this question, however, is limited by the "Timing of review" provision set out in CERCLA § 113(h), 42 U.S.C. § 9613(h), which we have twice interpreted as requiring a citizen seeking to challenge a remediation action to wait for the selected action to be completed. *Frey I*, 270 F.3d at 1133-34; *Schalk*, 900 F.2d at 1095. We elaborated on this point in our prior opinion when we explained that the time limits in § 113(h) are "geared to concrete, existing, remedial measures; not measures that might be devised at some future date." *Frey I*, 270 F.3d at 1134 (distinguishing between "active steps designed to clean up a site" and "hypothetical" future possibilities).

Contending that concrete and existing remedial measures are still underway at all three sites, EPA moved for summary judgment on the ground that Frey's action is barred by § 113(h). Frey responded that EPA's only "selected" remedy, the hot spots excavation, has been completed and no further remedies have been "selected" pursuant to federal regulations. The district court found that "the targeted excavation has been completed at each site. To date, the EPA has not selected a remedy for water treatment and sediment removal for any of the sites at issue." Nonetheless, the district court concluded that Frey's action was premature because "active remedial planning" was underway. It granted EPA's motion for summary judgment. Frey appeals.

## II

The parties agree on little in this case, including the basic question of what standard of review applies. Frey contends that we should apply a *de novo* standard because the case presents a question of statutory interpretation decided on summary judgment. EPA urges us to apply the "clearly erroneous" standard, on the theory that the case at bottom involves the application of facts to a legal rule. *Jurcev v. Cent. Comm. Hosp.*, 7 F.3d 618, 623 (7th Cir. 1993), *cert. denied*, 511 U.S. 1081 (1994).

In our view, Frey has the better of the argument. Although it is true that *Jurcev* held that the clearly erroneous standard may be applied to cases in which "(1) the facts are undisputed, (2) the trial court is merely applying the law to the facts, and (3) the nonmoving party has made no request for a jury trial," *id.* at 623, this case does not fit that pattern. The trial court was not merely applying undisputed legal principles to agreed facts. Rather, this case raises a question of statutory interpretation, and thus the proper standard of review is *de novo. Zambrano v. Reinert*, 291 F.3d 964, 968 (7th Cir. 2002).

## III

CERCLA provides the statutory framework that guides cleanup of hazardous waste sites. To ensure that cleanup efforts would not be impeded by litigation, Congress enacted § 113(h), which provides in relevant part:

> No Federal court shall have jurisdiction . . . to review any challenges to removal or remedial action *selected* under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following: . . . .
>
> > (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

42 U.S.C. § 9613(h) (emphasis added). Frey has offered a straightforward interpretation of this language for our consideration: a citizen may bring suit once a "selected" remedy has been completed. She contends that EPA's only "selected" remedy, the excavation of PCBs adopted in the ROD Amendments, is now complete. Since EPA has not yet "selected" a remedy (through a ROD Amendment) to address the groundwater or sediment contamination, there is no remedial action that remains to be completed. Accordingly, Frey reasons, her suit may now go forward.

EPA has failed to offer an alternative interpretation of the statutory language. Instead, it hangs its hat on language from *Frey I* that says that a citizen suit may *not* go forward when only one stage of a broader remediation plan has been completed. In our prior opinion, we said that "[t]he statute does not say 'a remedial action,' or '*a stage* of a remedial plan.' Instead, it calls flatly for restraint from suit when 'remedial action' (period) remains to be done." 270

F.3d at 1134 (emphasis added). EPA contends that the excavation of PCBs is simply one stage of its proposed plan, and that Frey's suit is therefore prohibited until all phases, including water and soil remediation, have been completed.

But EPA's position avoids the real question here, which is whether the record shows that only a stage has been completed, or if it shows that an entire remedial measure has been completed. At oral argument, EPA's counsel asserted that the agency's ongoing investigation and testing of groundwater and soil contamination precludes review under the statute. But what if EPA decides to study the contamination for an indeterminate period of time without taking any remedial action? Counsel had no response when asked whether the statute precludes review if EPA claims that it will take action, after further study, at some point before the sun becomes a red giant and melts the earth. We then asked counsel whether a reviewing court could invoke the Administrative Procedures Act (APA), 5 U.S.C. § 706(1), to compel agency action unlawfully withheld or unreasonably delayed, if EPA dragged its feet for decades. Counsel informed us that a court could not act under these circumstances because CERCLA's rules governing judicial review override the APA. See 5 U.S.C. § 702 (stating that Administrative Procedures Act review is not available when "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"); *Schalk*, 900 F.2d at 1097. We can only conclude from this exchange that EPA considers itself protected from review under CERCLA § 113(h) as long as it has any notion that it might, some day, take further unspecified action with respect to a particular site.

There is no support in the statute for such an open-ended prohibition on a citizen suit. *Frey I* spoke of "active steps designed to clean up a site" and held that "the time limits in § 113(h) are geared to concrete, existing, remedial measures; not measures that might be devised at some future

date." 270 F.3d at 1134. For EPA to delay Frey's suit, it must point to some objective referent that commits it and other responsible parties to an action or plan. No such objective evidence exists in this record. There is no timetable or other objective criterion by which to assess when EPA's amorphous study and investigation phase may end. The special master's report, adopted in 1999 by the district court, instructed EPA and Viacom to negotiate permanent water treatment solutions for the sites "approximately one year following the completion of source control activities at each site." Source control activities were completed in 1999 and 2000, yet EPA concedes in its brief on appeal that no permanent water or soil treatment remedies have been adopted to date. At argument, EPA's counsel alluded to the possibility of further measures in 2005 or 2006. We are unimpressed with this vague reference, unsupported by any timetable in the record.

In its ROD Amendments, EPA referred to future "operable units" that will be implemented to address the contaminated groundwater and sedimentation once excavation has been completed. See 40 C.F.R. § 300.430(a)(1)(ii)(A) (discussing use of "operable units" in remediating contaminated sites). We recognize that environmental regulations may call for a phased approach in expediting total site cleanup. *Id.* And it is quite clear that EPA is entitled to gather data and assess alternatives before selecting an appropriate response. But the data collection and analysis must proceed with some level of transparency. EPA cannot preclude review by simply pointing to ongoing testing and investigation, with no clear end in sight.

Frey offers one solution to this problem. She asks us to read the text of § 113(h) narrowly to preclude review only when EPA has selected a remedy through its Record of Decision process. Frey concedes that if EPA had selected a final remedy for all three operable phases (excavation,

water treatment, sediment treatment) through a ROD, she could not bring suit until all three remedies had been fully implemented. But it did not do so. In this case, she contends, plans for groundwater and sediment remediation cannot reasonably be characterized as later stages of the excavation remedy that EPA has already selected.

Frey is correct insofar as there is no evidence of any kind that EPA will be doing anything specific in the future with this site. We do not go so far as to hold that EPA must have issued either a ROD or a ROD Amendment before it obtains the breathing room afforded by § 113(h). We conclude only that there must be some objective indicator that allows for an external evaluation, with reasonable target completion dates, of the required work for a site. (Although we are sure that EPA would not try to avoid the statute by submitting a 100-year plan, we note that such a target date would obviously be unreasonable.) Neither the consent decree nor the special master's report serves as an objective measure here. Instead, we see only a desultory testing and investigation process of indefinite duration.

We address one final point. Section 113(h)(4) bars suit "with regard to a removal where a remedial action is to be undertaken at the site." The district court noted that § 113(h)(4) bars lawsuits when "the process of investigation and analysis—by definition a 'removal' action—is underway in order to determine what 'remedial' action is to be taken." Thus, the district court found that Frey's complaint was premature. This language might be read to suggest that the district court thought that Frey was challenging a removal, rather than a remedial, action. This, in any event, is a theme that Viacom has advanced on appeal: it argues that its ongoing investigations are part of a removal action under the statute. It is incorrect.

CERCLA response actions fall into two categories: removal and remedial actions. Removal refers to a short-term action

taken to halt risks posed by hazardous wastes immediately. Remedial actions involve permanent solutions, taken instead of or in addition to removal, such as the destruction of hazardous materials. 42 U.S.C. § 9601(23) & (24); *Schalk*, 900 F.2d at 1092 n.1; *State of Alabama v. EPA*, 871 F.2d 1548, 1551 n.1 (11th Cir. 1989). This case concerns a challenge to a remedial action, because it deals with "actions consistent with permanent remedy" including excavation and destruction of hazardous materials. 42 U.S.C. § 9601(24). Furthermore, EPA's Remedial Project Manager stated unequivocally that this is a remedial action.

Viacom points out that the following phrase in the definition of removal encompasses the testing and investigation of water and sediment contamination: "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." A reading of the full definition, however, indicates that removal is concerned with minimizing and mitigating damage from the "threat of release" of a hazardous substance through measures such as "security fencing", "temporary evacuation" and "emergency assistance." 42 U.S.C. § 9601(23). This does not describe the decades-long study and excavation of the PCBs and other toxins that have contaminated the Bloomington environment.

We recognize that Congress intended for remedial action to be complete before permitting judicial review. *Frey I*, 270 F.3d at 1133; *Schalk*, 900 F.2d at 1095. Congress did not, however, intend to extinguish judicial review altogether. *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1245 (7th Cir. 1991). After a very long wait, the citizens of Bloomington are finally entitled to their day in court.

## IV

For these reasons, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*