In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3597 & 10-3598

IN THE MATTER OF:
RIVER ROAD HOTEL PARTNERS, LLC,
RIVER ROAD EXPANSION PARTNERS, LLC,
RADLAX GATEWAY HOTEL, LLC and
RADLAX GATEWAY DECK, LLC,

*Debtors-Appellants*,

*v.*

AMALGAMATED BANK,

*Appellee.*

Appeals from the United States Bankruptcy Court
for the Northern District of Illinois, Eastern Division.
Nos. 09-B-30029, 09-B-30047—**Bruce W. Black**, *Bankruptcy Judge*.

ARGUED APRIL 7, 2011—DECIDED JUNE 28, 2011

Before CUDAHY, MANION, and HAMILTON, *Circuit Judges*.

CUDAHY, *Circuit Judge.* Debtors-Appellants appeal from a bankruptcy court order denying the bid procedures motions that they filed in connection with the their Chapter 11 reorganization plans. They argue that the bankruptcy

court erred in finding that their plan could not be confirmed over the objections of its secured creditors because it did not qualify for "fair and equitable" status under 11 U.S.C. § 1129(b)(2)(A). We affirm.[1]

## I. Factual Background

### A. The River Road Debtors

In 2007 and 2008, River Road Hotel Partners, LLC, River Road Expansion Partners, LLC, and related entities ("the River Road Debtors") built the InterContinental Chicago O'Hare Hotel and affiliated event space. In order to construct the hotel and event space, these entities obtained construction loans totalling approximately $155,500,000 from the Longview Ultra Construction Loan Investment Fund and the Longview Ultra I Construction Loan Investment Fund ("the River Road Lenders"). The loan documents designated Amalgamated Bank as the administrative agent and trustee of the River Road Lenders.

The InterContinental Chicago O'Hare Hotel and affiliated facilities opened in September 2008. Several months later, the River Road Debtors requested that the River Road Lenders supply them with several million dollars

---

[1] This opinion has been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). No judge asked to hear this case en banc. Judge Flaum took no part in the consideration or decision of this case.

in additional funding so that they could finish building the hotel's restaurant and pay their general contractors and suppliers. The River Road Lenders entered into negotiations with the River Road Debtors concerning the conditions under which additional funding would be provided, but the parties could not agree on mutually satisfactory terms.[2]

On August 17, 2009, each of the River Road Debtors filed voluntary petitions for relief under Chapter 11 of 11 U.S.C. §§ 101, *et seq.* (the Bankruptcy Code, hereinafter "the Code") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. At the time the petition was filed, the River Road Debtors owed at least $140,000,000 on the loans, with over $1,000,000 in interest accruing per month. In addition, approximately $9,500,000 in mechanics' liens have been asserted against the InterContinental Chicago O'Hare Hotel and its affiliated event spaces.

### B. The RadLAX Debtors

In 2007, RadLAX Gateway Hotel, LLC, purchased the property now known as the Radisson Hotel at Los Angeles

---

[2] The River Road Lenders hesitancy to extend the River Road Debtors additional credit is understandable, given that the River Road Debtors had already been provided with additional funds once and defaulted under one of the existing loans by failing to make required interest payments.

International Airport. In order to purchase the hotel, pay for renovations and build a parking structure on an adjacent parcel of real estate (which was to be owned by a related entity, RadLAX Gateway Deck, LLC), RadLAX Gateway Hotel, LLC, and its affiliates ("the RadLAX Debtors") obtained a construction loan totaling approximately $142,000,000 from the Longview Ultra Construction Loan Investment Fund ("the RadLAX Lenders"). The loan documents designated Amalgamated Bank as the administrative agent and trustee of the RadLAX Lenders.

During the course of building the parking structure the RadLAX Debtors incurred several million dollars of unanticipated costs. Around March 2009, the RadLAX Debtors ran out of funds and had to halt construction.[3] The RadLAX Lenders entered into negotiations with the RadLAX Debtors concerning the conditions under which additional funding would be provided, but the parties could not agree on mutually satisfactory terms.

On August 17, 2009, each of the RadLAX Debtors filed voluntary petitions for relief under Chapter 11 of the Code in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

---

[3] While the RadLAX Lenders claim that the RadLAX Debtors exhausted all of the money available under their loan, the RadLAX Debtors claim that they only came up short because the RadLAX Lenders improperly denied their construction draw requests. Which account is correct is inconsequential for the purposes of this appeal.

At the time the petition was filed, the RadLAX Debtors owed at least \$120,000,000 on the loans, with over \$1,000,000 in interest accruing per month. In addition, over \$15,000,000 in mechanics' liens have been asserted against the RadLAX properties.

## C. Proceedings Before the Bankruptcy Court

On August 20, 2009, the bankruptcy court entered orders directing the joint administration of the River Road Debtors' bankruptcy cases under Case No. 09-30029. The court also entered orders directing the joint administration of the RadLAX Debtors' bankruptcy cases under Case No. 09-30047. Each set of Debtors continues to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Code.

On June 4, 2010, the River Road and RadLAX Debtors (collectively, "the Debtors") submitted their reorganization plans to the bankruptcy court for confirmation. Both plans sought to sell substantially all of the Debtors' assets, with the proceeds to be distributed among the Debtors' creditors in accordance with the Code's priority rules. The Debtors also filed motions requesting the court's approval of their proposed procedures for conducting the asset sales. Both sets of proposals sought to auction off the Debtors' assets to the highest bidder, with the initial bid in each auction being supplied by a stalking horse bidder that had been lined up in the post-petition, pre-plan period. In one of their bid procedures motions, the River Road Debtors claimed that they had procured a stalking

horse offer of $42,000,000 for their assets. On June 22, 2010, the RadLAX Debtors filed copies of a proposed asset purchase agreement that offered $47,500,000 for their assets.

On July 8, 2010, Amalgamated Bank, on behalf of the River Road and RadLAX Lenders (collectively, "the Lenders"), filed objections to the Debtors' proposed bid procedures. Because the Debtors' plans would impair the Lenders' interests and the Lenders had not accepted the plans, they could not be confirmed unless they qualified for one of the exceptions listed in Section 1129(b)(2)(A) of the Code. *See* 11 U.S.C. § 1129(a)(8), (b). Amalgamated argued that the Debtors' plans could not satisfy Section 1129(b)(2)(A)'s requirements because they sought to sell encumbered assets free and clear of liens without allowing the Lenders to bid their credit at the asset auctions, in violation of 11 U.S.C. § 1129(b)(2)(A)(ii)'s requirement that secured lenders be given credit-bidding rights. The Debtors filed omnibus replies to Amalgamated's objections, arguing that, while their plans did not comply with Section 1129(b)(2)(A)(ii)'s requirements, they were still confirmable because they satisfied Section 1129(b)(2)(A)(iii)'s requirements.

On July 22, 2010, the bankruptcy court orally ruled that the Debtors' plans could not be confirmed under Section 1129(b)(2)(A)(iii). On October 5, 2010, the court entered orders denying the Debtors' bid procedure motions. The Debtors filed notices of appeal and motions requesting that the bankruptcy court certify their appeals directly to this

court pursuant to 11 U.S.C. § 158(d)(2)(A). On November 4, 2010, the court entered certifications for direct appeal to this court for both cases. On November 30, 2010, we entered an order authorizing and consolidating the River Road and RadLAX appeals.

## II. Discussion

This appeal presents two issues for this court to decide. First, we must determine whether events that occurred subsequent to the filing of the appeal have mooted the parties' dispute. Second, if we find that the appeal is not moot, we must turn to the merits of the Debtors' appeal and decide whether the bankruptcy court's interpretation of 11 U.S.C. § 1129(b)(2)(A) was correct.

### A. The Issue Raised by the Debtors' Appeal Is Not Moot

The Lenders claim that it would be inappropriate for this court to review the bankruptcy court's denial of the Debtors' bid procedure motions because the Debtors' proposed plans are no longer pending before the bankruptcy court. The Lenders contend that the reorganization plans that the court originally considered are no longer viable due to the passing of several expiration dates contained in the asset purchase agreements that the Debtors filed. They alternatively argue that statements from the Debtors indicate that the Debtors have abandoned their original reorganization plans.

We reject the Lenders' mootness argument. While "it is well-settled that a federal court has no authority to give opinions upon moot questions or abstract propositions," *Porco v. Trs. of Ind. Univ.*, 453 F.3d 390, 394 (7th Cir. 2006), an issue will not be considered moot unless the parties lack a "legally cognizable interest in the outcome." *Olson v. Brown*, 594 F.3d 577, 580 (7th Cir. 2010). It does not appear that the Debtors' reorganization plans suffer from either of the defects—the passing of expiration dates or abandonment—identified by the Lenders. On February 15, 2011, the RadLAX Debtors filed an amended asset purchase agreement with the bankruptcy court that largely resembled the agreement that was submitted in connection with the original reorganization plans. On March 2, 2011, the River Road Debtors filed a similar agreement. None of the confirmation deadlines contained in the amended agreements have expired. Further, the Debtors' statements before this court and the fact that they have filed amended agreements provide convincing evidence that the Debtors have not abandoned their asset sale plans.

Even if we were to find that the Debtors' original reorganization plans were based on asset purchase agreements that had expired, the Lenders have failed to show why this appeal would not fit squarely within the exception to mootness that we have recognized for cases that, due to timing issues, would otherwise evade review. *See, e.g., Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000). A court can disregard mootness and retain jurisdiction over an appeal when the challenged action is

(1) too short in duration to be fully litigated prior to cessation or expiration and (2) there is a reasonable expectation that the same appealing party will be subject to the same action again. *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. at 462.

This appeal satisfies both of these requirements. First, essentially all bankruptcy plans that seek to liquidate the debtor's assets will be based on asset purchase agreements that contain sales provisions with confirmation deadlines. These deadlines are, by economic necessity, quite short in duration. Hence, it will rarely, if ever, be the case that an appellate court would have the opportunity to review a bankruptcy court's confirmation decision prior to the expiration of such deadlines. Second, it is reasonable to expect that, if this appeal were dismissed for mootness, the Debtors would simply re-file their reorganization plans with new asset purchase agreements and the bankruptcy court would deny confirmation on the same grounds, giving the Debtors grounds for bringing the same appeal before this court.

### B. 11 U.S.C. § 1129(b)(2)(A) Does Not Authorize Debtors To Use Subsection (iii) To Confirm a Reorganization Plan that Seeks To Sell Encumbered Assets Free and Clear of Liens Without Providing Secured Creditors the Right To Credit Bid

The Debtors contends that the bankruptcy court misinterpreted Section 1129(b)(2)(A) of the Code when it held

that their plans could not be confirmed because they did not "comply with the specific requirements of Section 1129(b)(2)(A)(ii)." They argue that their plans should have been confirmed because they satisfied the conditions set forth in Section 1129(b)(2)(A)(iii). Thus, this appeal presents a single, relatively straightforward question concerning the proper interpretation of Section 1129(b)(2)(A) and its subsections.

The bankruptcy court held that, when a debtor's reorganization plan has not been approved by its secured creditors and proposes the sale of encumbered assets free and clear of liens, Section 1129(b)(2)(A) provides the exclusive means by which it can be confirmed. The court did not attempt to provide its own in-depth justification for its construal of Section 1129(b)(2)(A), but stated that its holding was based upon the statutory analysis set forth in Judge Ambro's dissent in *In re Philadelphia Newspapers*, 599 F.3d 298 (3d Cir. 2010). Because we review a bankruptcy court's interpretation of the Code's provisions under the *de novo* standard, we must conduct our own, independent analysis of Section 1129(b)(2)(A)'s meaning. *Frey v. EPA*, 403 F.3d 828, 833 (7th Cir. 2005).

### (1) Overview of Section 1129(b)(2)(A) and Relevant Precedents

Before attempting to decipher Section 1129(b)(2)(A)'s proper meaning, a brief review of the statute and the way it has been construed by the courts is merited. Section 1129 of the Code sets forth the criteria that a debtor's Chapter 11 reorganization plan must satisfy to be confirmed by

a bankruptcy court. While the Code generally requires that reorganization plans be accepted by each class of claimants (or, alternatively, leave the claims of non-assenting classes unimpaired), *see* 11 U.S.C. § 1129(a)(8), Subsection (b) of Section 1129 excepts certain plans from this requirement. Plans that are confirmed under Section 1129(b) are often referred to as cramdown plans because they have been "crammed down the throats of objecting creditors." *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1359 (7th Cir. 1990). Subsection (b)(1) states that, in order for a plan to be confirmed over the objection of a class of creditors, it must be "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Subsection (b)(2)(A) defines what constitutes "fair and equitable" treatment in the secured creditor context. It states that a plan is "fair and equitable" if it provides:

(i)

   (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

   (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

Traditionally, the majority of cramdown plans have sought confirmation under Subsection (ii) of 1129(b)(2)(A). Given the detailed and carefully tailored language used in this subsection, it has rarely been difficult for courts to determine whether plans qualify for "fair and equitable" status. Plans that propose selling an encumbered asset free and clear of liens could be confirmed over the objections of secured creditors so long as the debtor's asset sale complies with Section 363(k) of the Code. Sales comply with Section 363(k) if they permit parties with secured claims to "offset [their] claim against the purchase price of [the asset]" when entering bids to purchase the asset, an arrangement that is popularly referred to as credit bidding.

An increasing number of debtors, however, have begun to seek confirmation of their plans under Subsection (iii) of 1129(b)(2)(A). Because the language used in this provision is both sparse and general, determining whether a reorganization plan can qualify as "fair and equitable" under this subsection is no simple task. As written, the statute does not provide guidance concerning (1) what types of plans fall within Subsection (iii)'s scope or

(2) what constitutes the "indubitable equivalent" of a secured creditor's claim. Resolving the first issue is not easy because nothing in the text of Section 1129(b)(2)(A) indicates whether subsection (iii) can be used to confirm every type of reorganization plan or only those plans that fall outside the scope of Subsections (i) and (ii). Resolving the second issue is difficult because "indubitable equivalent" is not a term that has been defined by the Code or the courts. *In re Pacific Lumber, Co.*, 584 F.3d 229, 246 (5th Cir. 2009) (noting that "[w]hat measures constitute the indubitable equivalent of the value of the [secured creditor's] collateral are rarely explained in case law").

Two of our sister circuits recently issued opinions analyzing Section 1129(b)(2)(A). *Philadelphia Newspapers*, 599 F.3d 298; *Pacific Lumber*, 584 F.3d 229. In *Pacific Lumber*, the Fifth Circuit held that a plan that proposed the sale of the debtor's encumbered assets to a specified purchaser for an amount equal to the judicially-determined value of the assets qualified as "fair and equitable" under Subsection (iii) of Section 1129(b)(2)(A). *Pacific Lumber*, 584 F.3d at 249. In *Philadelphia Newspapers*, the Third Circuit held, in a 2-1 decision with one of the members of the majority concurring in the judgment, that a plan that proposed selling the debtor's encumbered assets free and clear of liens in an auction where credit bidding would not be allowed could qualify as "fair and equitable" under Subsection (iii). *Philadelphia Newspapers*, 599 F.3d at 318. Both majority opinions held that Subsection (iii)'s scope was not limited by its neighboring subsections and that the proceeds from the sale of encumbered assets constituted the indubitable equiva-

lent of the secured creditors' claims. Judge Ambro's dissent in *Philadelphia Newspapers* rejected both of these conclusions, arguing that the majority's reading of the statute was at odds with the text of the statute itself, various canons of statutory interpretation, the statute's legislative history, interests expressed in other parts of the Code and the settled expectations of lenders and borrowers.

### (2)   The Plain Language of Section 1129(b)(2)(A) Does Not Clearly Authorize Confirmation of the Debtors' Reorganization Plans

With this background information in mind, we can begin our analysis of Section 1129(b)(2)(A)'s meaning in earnest. When attempting to decipher the proper interpretation of a statute, we begin by determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). When interpreting statutory language, the meaning attributed to a phrase "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1330 (2011); *see also United States v. Webber*, 536 F.3d 584, 593 (7th Cir. 2008) (stating that "we give words their ordinary meaning unless the context counsels otherwise"). If we find that the language in a statute is unambiguous, we will not conduct further inquiry into its meaning and enforce the statute in accordance with its plain meaning. *BedRoc, Ltd. v. United*

*States*, 541 U.S. 176, 183 (2004); *Ind. Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 857 (7th Cir. 2003). Thus, the first step we must take in resolving this appeal is determining whether the language of Section 1129(b)(2)(A) unambiguously authorizes the confirmation of reorganization plans such as those proposed by the Debtors under Subsection (iii).

The Debtors contend that the plain language of Section 1129(b)(2)(A) orders courts to approve any cramdown plan—including those that propose selling encumbered assets free and clear of liens—that satisfies Subsection (iii)'s requirement that the plan provides secured creditors with the indubitable equivalent of their claims. They also argue that the statute's language unambiguously indicates that a plan that provides a secured creditor with the proceeds from the sale of an asset at an auction that does not permit credit bidding satisfies the indubitable equivalence requirement. In support of their positions, the Debtors cite the majority's decision in *Philadelphia Newspapers*, reiterating many of the arguments articulated in that case.[4] Unsurprisingly, the Lenders disagree with the Debtors' claims, arguing that cramdown plans that seek to sell encumbered assets free and clear of liens must satisfy Subsection (ii)'s requirements and that the Debtors' proposed sales would not provide the Lenders with

---

[4] Given that the Debtors' assets in this case have not gone through the judicial valuation process and the Debtors' reorganization plans involve using an auction to determine the assets' current value, it is clear that *Philadelphia Newspapers* is more relevant precedent than *Pacific Lumber*.

the indubitable equivalent of their claims. The Lenders contend that Judge Ambro's dissent in *Philadelphia Newspapers* provides a superior analysis of Section 1129(b)(2)(A).

We reject the Debtors' contentions for two reasons. First, like the bankruptcy court, we find the statutory analysis articulated by Judge Ambro in his *Philadelphia Newspapers* dissent to be compelling. Nothing in the text of Section 1129(b)(2)(A) directly indicates whether Subsection (iii) can be used to confirm any type of plan or if it can only be used to confirm plans that propose disposing of assets in ways that can be distinguished from those covered by Subsections (i) and (ii).[5] Hence, there are two plausible interpretations of the statute: one that reads Subsection (iii) as having global applicability and one that reads it as having a much more limited scope. *See Philadelphia Newspapers*, 599 F.3d at 324-27 (Ambro, J., dissenting). Because, at this stage of our analysis, we are limited to considering the plain text of the statute and "reasonable minds can differ on the interpretation of Section 1129(b)(2)(A) as it applies to plan sales free of liens," we

---

[5] We disagree with the *Philadelphia Newspapers* majority's conclusion that the use of "or" in Section 1129(b)(2)(A) resolves this issue. *Philadelphia Newspapers*, 599 F.3d at 305-06. While Section 102(5) of the Code indicates that "or" should be understood in the term's non-exclusive sense, several exceptions to this rule have been recognized. *See Philadelphia Newspapers*, 599 F.3d at 324 (Ambro, J., dissenting); Lawrence P. King et al., 2 *Collier on Bankruptcy* ¶ 102.06 (16th ed. Rev. 2011). Hence, the mere presence of the term "or" is insufficient to resolve this issue.

find that the statute does not have a single plain meaning. *Id.* at 322. Accordingly, we must look beyond the text of Section 1129(b)(2)(A) to determine which of its possible interpretations is the correct one. Second, we find that, even if we analyze Subsection (iii) of Section 1129(b)(2)(A) in isolation, the text of the provision does not unambiguously indicate that plans such as those proposed by the Debtors qualify for "fair and equitable" status. Subsection (iii) states that a reorganization plan can be confirmed over the objections of secured creditors if it provides the creditors with the "indubitable equivalent" of their claims. What constitutes the "indubitable equivalent" of a creditor's secured claim depends on the amount of the creditor's lien and the current value of the secured asset. If a creditor's claim is oversecured, then the indubitable equivalent of the creditor's claim is its face value. For instance, where a creditor has a $100,000 lien on an asset worth $500,000, a reorganization plan will only give the creditor the indubitable equivalent of its claim if it gives it something worth $100,000 (e.g., that amount in cash or a replacement lien for that amount on another asset). If a creditor's claim is undersecured, then the indubitable equivalent of the creditor's secured claim equals the current value of the asset. For instance, where a creditor has a $100,000 lien on an asset that has depreciated in value and is now worth less than $100,000, a reorganization plan will give the creditor the indubitable equivalent of its claim if the plan gives the creditor something worth the asset's current market value.

Determining the value of an undersecured creditor's claim is problematic because it is usually difficult to

discern the current market value of the types of assets that are sold in corporate bankruptcies. The Code recognizes two basic mechanisms for solving these types of valuation problems: judicial valuation of an asset's value, 11 U.S.C. § 506(a)(1), and free market valuation of an asset's value as established in an open auction, 11 U.S.C. §§ 363(k), 1129(b)(2)(A). The Debtors argue that, because their proposed plans would sell their assets at an open auction and the Lenders would receive the proceeds from these sales, the free market will determine the assets' current values and the Lenders will receive the indubitable equivalent of their secured claims.

The Debtors' argument is flawed, however, because of the incongruity between the auctions proposed in the plans and those recognized elsewhere in the Code. In order to auction off an encumbered asset free and clear of liens under Sections 363(k) or 1129(a)(2)(B)(ii), for instance, the Code requires that parties with secured interests in the assets be permitted to credit bid. By granting secured parties this ability, the Code provides lenders with means to protect themselves from the risk that the winning auction bid will not capture the asset's actual value. If a secured lender feels that the bids that have been submitted in an auction do not accurately reflect the true value of the asset and that a sale at the highest bid price would leave them undercompensated, then they may use their credit to trump the existing bids and take possession of the asset. In essence, by granting secured creditors the right to credit bid, the Code promises lenders that their liens will not be extinguished for less than face value without their consent. This protection is impor-

tant since there are number of factors that create a substantial risk that assets sold in bankruptcy auctions will be undervalued.[6]

---

[6] Multiple factors contribute to the risk that an asset will be undervalued in such sales. First, the speed and timing of a bankruptcy auction often results in undervaluation. Lorie R. Beers, *Preparing the Distressed Company for Sale*, Am. Bankr. Inst. J. 44, 45 (Aug. 26, 2007). Second, and closely related, is the inability to provide sufficient notice to interested parties. *See id.* at 69 (explaining that because of financial constraints, the development of formal marketing materials and notice to prospective buyers is often abbreviated, resulting in a shorter list of interested parties and thereby reducing the chance that the sale will result in full realization of the asset's value). Third, there is an inherent risk of self-dealing on the part of existing management. We have recognized that existing management may have an incentive to favor "white knight" bidders favorably disposed to preserving the existing business over others who might enter higher bids. *See Dynamic Corp. of Am. v. CTS Corp.*, 805 F.2d 705, 711 (7th Cir. 1986). Fourth, while the credit markets are more recently showing signs of repair, they remain in a state of limited liquidity. Liquidity constraints are likely to keep many potential bidders on the sidelines, greatly reducing the chance that competitive bidding will occur. Finally, the fact that bidders must expend their resources when putting together a bid and are likely to take these costs into consideration when setting the value of their bids increases the chance that the asset's sale price will not reflect its actual value. *See* Vincent S. J. Buccola & Ashley C. Keller, *Credit Bidding and the Design of Bankruptcy Auctions*, 18 Geo. Mason L. Rev. 99, 121 (2010) (noting that an estate is

(continued...)

Because the Debtors' proposed auctions would deny secured lenders the ability to credit bid, they lack a crucial check against undervaluation. Consequently, there is an increased risk that the winning bids in these auctions would not provide the Lenders with the current market value of the encumbered assets. Nothing in the text of Section 1129(b)(2)(A) indicates that plans that *might* provide secured lenders with the indubitable equivalent of their claims can be confirmed under Subsection (iii). Hence, we find that a plain-meaning reading of Subsection (iii)'s text does not establish that it can be used to confirm plans that propose auctioning off a debtor's encumbered assets free and clear of liens without allowing credit bidding.

### (3) The Better Interpretation of Section 1129(b)(2)(A)(iii) Does Not Permit Confirmation of the Debtors' Reorganization Plans Under Subsection (iii)

Because the text of Section 1129(b)(2)(A) suggests more than one plausible understanding of the statute, we must apply well-established principles of statutory interpretation to determine which of these understandings is superior. In general, canons of statutory construction urge courts to interpret statutes in ways that make every part of the statute meaningful. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Interpretations that result in provisions being

---

[6] (...continued)

unlikely to realize the entire value of an asset because bids will take into account the bidders' financing costs).

superfluous are highly disfavored. *Id.* Further, when deciding between competing understandings of a statute, courts often consider the objectives of the larger statutory scheme and select the meaning that "produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,Ltd.*, 484 U.S. 365, 371 (1988); *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004).

The Debtors' proposed interpretation of Section 1129(b)(2)(A) violates a cardinal rule of statutory construction. One of the basic tenets that courts follow when interpreting ambiguous text states that "a statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). The first two Subsections of 1129(b)(2)(A) set forth the specific conditions that reorganization plans that seek to sell encumbered assets in particular manners must meet. Subsection (i) sets forth requirements that apply to all plans where the debtor seeks to retain possession of or sell an encumbered asset with the liens attached. Subsection (ii) sets forth requirements that apply to all plans that seek to sell an encumbered asset free and clear of liens. The Debtors propose that we should read Subsection (iii) as stating that any plan that satisfies a general requirement—the indubitable equivalence standard—should be granted "fair and equitable" status. Under their interpretation, plans could qualify for treatment under Subsection (iii) even if they seek to dispose of encumbered assets in the ways discussed in Subsections (i) and (ii), but fail to meet these Subsections' requirements.

This understanding of Section 1129(b)(2)(A)(iii) is unacceptable because it would render the other subsections of the statute superfluous.[7] If, as the Debtors propose, Subsection (iii) permits a debtor to sell an asset free and clear of liens without permitting credit bidding, then it is difficult to see what, if any, significance Subsection (ii) can have. Similarly, the Debtors' interpretation would permit properly-designed reorganization plans to sell encumbered assets without satisfying the conditions set forth in Subsection (i). We cannot conceive of a reason why Congress would state that a plan must meet certain requirements if it provides for the sale of assets in particular ways and then immediately abandon these require-

---

[7] This interpretation would also violate the canon of statutory construction that states that when "there is an inescapable conflict between general and specific . . . provisions of a statute, the specific will prevail." Norman J. Singer & J.D. Shambie Singer, 2A *Sutherland Statutes & Statutory Construction* § 46:5; *see also Bloate v. United States*, 130 S.Ct. 1345, 1354 (2010) (stating that "general language of a statutory provision, although broad enough to include [a matter], will not be held to apply to a matter specifically dealt with in another part of the same enactment"). Allowing plans to use Subsection (iii) to accomplish a sale free of liens without according lenders the procedural protections prescribed by clause (ii) "places the two clauses in conflict" and would allow the general to subsume the specific. *In re Philadelphia Newspapers*, 559 F.3d at 329 (Ambro, J., dissenting).

ments in a subsequent subsection.[8] The infinitely more plausible interpretation of Section 1129(b)(2)(A) would read each subsection as stating the requirements for a particular type of sale and "construing each of the [] subparagraphs . . . [as conclusively governing] the category of proceedings it addresses." *Bloate v. United States*, 130 S. Ct. 1345, 1355 (2010). Under such a reading, plans could only qualify as "fair and equitable" under Subsection (iii) if they proposed disposing of assets in ways that are not described in Subsections (i) and (ii).

Also counseling against the Debtors' interpretation of Section 1129(b)(2)(A)(iii) is the fact that it treats secured creditors' interests in a way that sharply conflicts with the way that these interests are treated in other parts of the Code. A review of the "sections of the Code related to plan sales of encumbered property free of its liens, as well as sections concerning the protection afforded to secured creditors," reveals that the Code has an expressed interest in insuring that secured creditors are properly

---

[8] Indeed, the legislative history for Section 1129(b)(2)(A) indicates that Subsection (iii) was intended to apply to plans that propose treating the estate's encumbered assets in ways that are different from those covered by Subsection (i) and (ii). *In re Philadelphia Newspapers*, 559 F.3d at 335-36 (Ambro, J., dissenting) (reviewing the congressional record and noting that neither of the examples of plans that a court could confirm under clause (iii)—abandonment of the encumbered asset or providing the secured creditor with a replacement lien on similar collateral— overlap with plans that could be confirmed under Subsections (i) and (ii)).

compensated. *Philadelphia Newspapers*, 599 F.3d at 331 (Ambro, J., dissenting). For instance, Sections 363(k) and 1129(b)(2)(A)(ii) provide a secured creditor with the right to credit bid whenever a debtor attempts to sell the asset that secures its debt free and clear of its lien. *Id.* Similarly, Section 1111(b) provides secured creditors with means to protect their claims when a debtor seeks to retain possession of an encumbered asset. *See In re 680 Fifth Ave. Assocs.*, 29 F.3d 95, 97-98 (2d Cir. 1994); Lawrence P. King et al., 7 *Collier on Bankruptcy* ¶ 1111.03 (16th ed. Rev. 2011). In contrast, the Code does not appear to contain any provisions that recognize an auction sale where credit bidding is unavailable as a legitimate way to dispose of encumbered assets. Because the Debtors' interpretation of Section 1129(b)(2)(A) would not provide secured creditors with the types of protections that they are generally accorded elsewhere in the Code, their interpretation is less plausible than a construction of the statute that reads Subsection (ii), which offers the standard protections to creditors, as providing the only way for plans seeking to sell encumbered assets free and clear of liens to obtain "fair and equitable" status. *Philadelphia Newspapers*, 599 F.3d at 331 (Ambro, J., dissenting).

Because the Debtors' suggested reading of Subsection (iii) would nullify its neighboring subsections and ignore the protections for secured creditors recognized in other Code provisions, we reject their interpretation of the statute. Instead, we find that the Code requires that cramdown plans that contemplate selling encumbered assets free and clear of liens at an auction satisfy the requirements set forth in Subsection (ii) of the statute.

### III. Conclusion

For these reasons, the ruling of the bankruptcy court is

AFFIRMED